## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

MICCOSUKEE TRIBE OF INDIANS       CASE NO.: 08-21747-CIV-UNGARO
OF FLORIDA,
           **Plaintiff,**

vs.

UNITED STATES OF AMERICA, et al.
        **Defendants.**

                                  /

### PLAINTIFF MICCOSUKEE TRIBE'S MOTION
### FOR PRELIMINARY INJUNCTIVE RELIEF
### AND INCORPORATED MEMORANDUM OF LAW

The Miccosukee Tribe of Indians of Florida ("Tribe"), by and through its undersigned counsel, hereby moves this Court for an order granting injunctive relief pursuant to Federal Rule of Civil Procedure 65(a) against the Defendants.   This motion is based on the Plaintiff's Amended Complaint (DE 17), affidavits, agency documents, and other evidence of the Defendants' direct violations of the National Environmental Policy Act ("NEPA"), the Water Resources Development Act of 2000 ("WRDA 2000"), § 601 (b)(2)(c), Pub. L. No. 106-541 (S 2796) (2000), and the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. § 1, et seq.

The Tribe hereby requests that this Court immediately enjoin the Defendants from commencing the design aspect and the construction of modifications to Tamiami Trail, as set forth in the *Modified Water Deliveries to Everglades National Park Tamiami Trail Modification Limited Reevaluation Report and Environmental Assessment*, dated June 2008 ("LRR/EA"). (A copy of the LRR/EA is attached as Exhibit "A" to companion case S.D. Fla. Case No. 08-21703-Civ-Ungaro, D.E. 3.)  An injunction is necessary based on the following:

### I. INTRODUCTION

The United States Army Corps of Engineers ("Corps") has publicly stated that it is in the process of completing the design, and will soon be seeking a contractor to construct, its Recommended Plan Alternative 3.2.2.a, a one-mile bridge in Everglades National Park ("ENP") that will be part of US Highway 41, also known as Tamiami Trail. See LRR/EA at 2-3, 4-61, 5-7, 6-2.

The Recommended Plan will convert park land to highway right of way. LRR/EA, p. 5-39.  The Corps  violated the National Environmental Policy Act, 42 U.S.C. §§ 4332 by failing to conduct a Supplemental Environmental Impact Statement  ("SEIS") on Alternative 3.2.2.2a, before adopting it as the Recommended Plan in the June 2008 LRR/EA and the June 20, 2008 Finding of No Significant Impact ("FONSI").  The failure to conduct an SEIS, and the Corps' claim in the FONSI that an EIS was not needed, was arbitrary and capricious, an abuse of discretion, and otherwise acted not in accordance with law.  The Recommended Plan will significantly and adversely affect the physical environment, including but not limited to destruction of natural resources in Everglades National Park, destructive flooding and degradation of the central Everglades in Water Conservation Area 3A ("WCA 3A"), decreased Everglades biodiversity, destruction of Everglades tree islands and injury to wildlife, and increased risk of flooding of land interests of the Tribe and others.  The Corps failed to analyze these impacts in an SEIS, as is required under NEPA. The Corps' failure to conduct the SEIS required by law significantly and adversely impacts the Miccosukee Tribe and its members.

In addition, the Corps established and/or utilized an  advisory group of federal and non-federal participants (the "LRR Team") to provide advice and recommendations in the LRR/EA process, and rubber stamped the group's recommendation as the Recommended Plan.  The Corps did not  follow the requirements of FACA, which governs the conduct of federal advisory committees. In so doing, the Corps acted in a manner that is arbitrary, capricious an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The Corps' reliance upon documents, performance measures, or other advice and recommendations (i.e. the Recommended Plan) produced by this advisory group significantly and adversely impacts the Miccosukee Tribe.   Unless the injunctive relief requested herein is granted, the Tribe will suffer further significant irreparable injury in that its rights to know about, attend and participate in matters that impact Plaintiff's homelands in the Everglades will be abridged and denied and the advisory group could continue to give advice that will harm Plaintiff's lands.

Finally, the Corps' proposal to build a one mile eastern bridge as part of Tamiami Trail as the Recommended Plan, violates the express prohibition in the Water Resources Development Act of 2000 ("WRDA 2000") against  bridging the east portion of Tamiami Trail until the Modified

Water Deliveries Project is completed. WRDA 2000, which is the legislation that adopted the Comprehensive Everglades Restoration Plan ("CERP"), specifically  mandated that the Modified Water Deliveries Project must be completed before the eastern portion of Tamiami Trail  could be raised and bridged.    Plaintiff Tribe has suffered harm because of Defendants' unlawful plan to bridge an east portion of  Tamiami Trail, which will perpetuate high water levels on Tribal Everglades in WCA 3A and could flood Tribal businesses along Krome Avenue, which the Modified Water Deliveries Project, and CERP Decompartmentalization Project, are designed to relieve and prevent.

As explained herein and the affidavits attached to this motion, Plaintiff Tribe is likely to prevail on the merits of its case. Enjoining the Defendants from implementing the Recommended Plan that was not subject to the SEIS required under NEPA; bridges eastern Tamiami  Trail in violation of WRDA 2000; and adopts the recommendation of an advisory group without complying with FACA is necessary to  preserve the status quo.  Allowing the Defendants to implement the Recommended Plan, which was adopted in violation of NEPA, FACA and WRDA 2000 would cause the Tribe irreparable injury if injunctive relief is denied.  As discussed below, balancing of the equities favors the Tribe in this matter, and the public interest will be served by preserving the status quo pending resolution of Plaintiff's claims.

## II. STATEMENT OF FACTS

The Miccosukee Tribe of Indians of Florida ("Tribe") is a federally recognized and federally protected Indian Tribe, exercising powers of self-government under a Tribal constitution approved by the Secretary of the Interior, pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. § 476. The Tribe's members reside and work within the Florida Everglades on Indian lands in the Miccosukee Reserved Area ("MRA"), on the border of Everglades National Park ("ENP")  and on perpetually-leased Indian lands and Federal Reservation lands.  DE 17 at ¶1.  The Tribe's members depend upon the Everglades for their entire culture and way of life. Id.  The Everglades has been the home of the Miccosukee people for centuries and is an integral part of their culture, subsistence, religion, historical identity, and way of life. DE 17 at ¶2.  As such, the Tribe has traditional, aboriginal, and statutory rights to use and occupy the Everglades and the Big Cypress.  Id.  The Miccosukee people have a spiritual and historical connection to the entire Everglades ecosystem and

3

presently use and enjoy the entire Everglades. Id.

The water flows and water levels throughout South Floirda and the Everglades are controlled by a series of man-made canals, pump stations and structures, operated as the Central and South Florida Project for Flood Control and Other Purposes ("C&SF Project"). DE 17 at ¶14. Historically, water flowed in a southerly direction from Lake Okeechobee into the Everglades and out into Florida Bay. The Everglades has been artificially segregated into the EAA, Water Conservation 1 (Loxahatchee National Wildlife Refuge), Water Conservation Area 2, Water Conservation Area 3 (3A and 3B) and Everglades National Park. DE 17 at ¶16.

WCA 3A is an area of the Everglades comprised of over 100,000 acres. DE 17 at ¶17. Current operations of the C&SF Project have caused flooding and sustained high water levels above natural levels in WCA 3A. DE 17 at ¶20. WCA 3A is an Everglades marsh with numerous tree islands that contribute significantly to the biodiversity of the Everglades. DE 17 at ¶18. U.S. Highway 41, commonly referred to as Tamiami Trail ("Tampa to Miami"), runs in and east and west direction north of the boundary of Everglades National Park and the Miccosukee Reserved Area and forms the southern boundary of WCA 3A. See LRR/EA at pp. 3-24. Tamiami Trail is a highway that transports an estimated 5,200 vehicles per day between Miami and Naples, which is estimated to increase to 9,200 vehicles per day by 2020. Id. The Modified Water Deliveries Project ("MWD Project") was authorized by the Everglades National Park Protection and Expansion Act of 1989 (Public Law 101-229, Section 104, 16 U.S.C. Part 410r-5 et seq.) in order to restore more natural water flows "to the extent practicable" from WCA 3A through WCA 3B and back into Northeast Shark River Slough located in Everglades National Park. DE 17 at ¶24. Miccosukee Tribal members and Miccosukee Tribal lands are directly affected by the Modified Water Deliveries Project. DE 17 at ¶30. Implementation of a properly designed MWD Project is essential to the health, safety, and welfare of the Miccosukee Tribe and its members. Id.

In 2000, Congress adopted the Comprehensive Everglades Restoration Plan ("CERP") as part of the Water Resources Development Act of 2000 ("WRDA 2000"). § 601 (b)(2)(C), Pub. L. No. 106-541 (S 2796) (2000); 114 Stat. 2572. The language in WRDA 2000 mandated that "[n]o appropriation shall be made to construct the Water Conservation Area 3 Decompartmentalization Sheetflow Enhancement Project (including . . . Raise and Bridge East Portion of Tamiami Trail . . .)

until the completion of the project to improve water deliveries to Everglades National Park authorized by Section 104 of the Everglades National Park Protection Act of 1989 (16 U.S.C. 410 r-8)." DE 17 at ¶34. CERP is anticipated to allow a greater volume of water to be conveyed through Tamiami Trial from WCA 3A to Everglades National Park than the volume of water anticipated to be conveyed under the Pre-CERP MWD Project. DE 17 at ¶35.

In June 2008, the Corps issued its LRR/EA, which adopted Alternative 3.2.2.a as the Recommended Plan. On June 20, 2008 the Corps signed a Finding of No Significant Impact ("FONSI") on the Recommended Plan. The FONSI claimed that the proposed action did not require a new EIS. The Corps refused to conduct an SEIS on the Recommended Plan , which is a one mile eastern bridge to be constructed in Everglades National Park as part of Tamiami Trail X. See LRR/EA at 4-61, 5-13, 5-39, 5-44, 5-51, 6-1 to 6-3. The Corps used an advisory committee referred to as the "team" or "LRR Team" in the LRR/EA process to develop performance measures and cost estimates, screen out alternatives, and recommend the final array of alternatives. DE 17 at ¶59. This advisory committee recommended Alternative 3.2.2.a to the Corps as the Tentatively Selected Plan ("TSP") in the April 2008 LRR/EA, which ultimately became the Recommended Plan in the June 2008 LRR/EA. Id. The LRR Team was comprised of federal and non-federal participants and included at least the non-federal South Florida Water Management District ("SFWMD") and the Department of Environmental Protection. ("DEP"). DE 17 at ¶60. The LRR Team met regularly in closed door meetings to provide advice and recommendations to federal agencies, which utilized their advice and recommendations in adopting the TSP, which ultimately became the Recommended Plan. DE 17 at ¶59. They also held a retreat to which the Plaintiff Tribe was not invited. DE 17 at ¶112.

Finally, WRDA 2000 requires that the MWD Project be completed before the CERP WCA 3 Decompartmentalization Project (designed to raise Tamiami Trail) could be funded and constructed. DE 17 at ¶34. Section 602(b)(2)(D)(iv) of WRDA 2000 entitled *Modified Water Delivery* states that "no appropriation shall be made to construct the Water Conservation Area 3 Decompartmentalization and Sheetflow Enhancement Project, which includes raising and Bridging the East Portion of Tamiami Trail , until the completion of the project to improve water deliveries to Everglades National Park authorized by Section 104 of the Everglades National Park and

Expansion Act of 1989 (16 U.S.C. 410r-8)." Plaintiff Tribe has suffered harm because of Defendants' unlawful plan to bridge an east portion of Tamiami Trail, which will perpetuate high water levels on Tribal Everglades in WCA 3A and could flood Tribal businesses along Krome Avenue, and which the Modified Water Deliveries Project, and CERP Decompartmentalization Project, are designed to relieve and prevent. DE 17 at ¶129; See Rice Affidavit at ¶23; Jones Affidavit at ¶¶17, 28.

## III. ARGUMENT

### A.   Standard for Preliminary Injunction

"Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction." Califano v. Yamasaki, 442 U.S. 682, 705 (1978). The standard to determine whether the issuance of an injunction is appropriate in regard to the Tribe's NEPA and WRDA 2000 counts is the traditional four-factor test, while the standard for the Tribe's FACA count is a two-part test.

The Tribe is entitled to injunctive relief for its NEPA and WRDA 2000 counts since it can demonstrate: (1) a substantial likelihood of prevailing on the merits of its claim at trial; (2) a substantial threat of irreparable injury if injunctive relief is denied; (3) that the injury to plaintiff outweighs threatened harm an injunction may do to defendants or others; (4) and that the injunction will serve the public interest. See, e.g., E. Remy Martin & Co. S.A. v. Shaw-Ross Int'l Imports, Inc., 756 F.2d 1525, 1530 n. 13 (11th Cir. 1985); Buchanan v. U.S. Postal Service, 508 F.2d 259, 266 (5th Cir. 1975); see also, Enviromental Defense v. U.S. Army Corps of Engineers, 2006 WL 1992626 (D.D.C. 2006) (This four-factor test also applies to the determination of the appropriateness of injunctive relief as to the WRDA claims).

"[T]he proper remedy for substantial procedural violations of NEPA . . . is an injunction." NRDC v. Houston, 146 F.3d at 1129, quoting Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1230 (9th Cir. 1988). Although "a finding that an agency has violated NEPA does not automatically result in an injunction, . . . the scales are from the outset tipped in favor of an injunction." Kettle Range Conservation Group v. United States Forest Service, 148 F.Supp. 2d 1107, 1135 (E.D. WA 2001) (citing Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 542 (1987)). Defendants must demonstrate "'unusual circumstances' which indicate that an injunction would be inappropriate."

Id. (quoting Forest Conservation Council v. United States Forest Service, 66 F.3d 1489, 1496 (9th Cir. 1995)).  Moreover, a NEPA claim remains justiciable until the agency fully complies with NEPA.  Greenpeace Foundation v. Mineta, 122 F.Supp.2d 1123, 1129 (D. Ha. 2000).

Injunctive relief is also an available remedy for a FACA violation in this Circuit. See Alabama-Tombigbee Rivers Coalition v. Department of Interior, 26 F.3d 1103, 1106 (11th Cir. 1994).  This Court need not apply the traditional four-factor test in determining whether injunctive relief in regard to the FACA count is appropriate in this case. Id. at 1106-07.  Instead, this Court may grant injunctive relief if it finds that 1) FACA has been violated and 2) that FACA would be "eviscerated if such relief were not granted." C.B. v. Board of Scholl Com'rs of Mobile Co., AL, 261 Fed.Appx. 192, 194  (11th Cir. 2008).

**B.     NEPA and WRDA 2000**

Defendants' direct violations of NEPA and WRDA 2000 demonstrate that Plaintiff has a reasonable likelihood of success on the merits in this case on these counts

**1.     Defendants Have Violated NEPA**

Under NEPA, 42 U.S.C. § 4332(2)(C), the Corps must prepare an EIS whenever it is proposing "major federal actions significantly affecting the quality of the human environment." NEPA and the CEQ regulations set forth specific procedural requirements for agencies to follow. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 558 (1978).  When the procedures of NEPA are not followed, agency actions will be set aside.  Save the Yaak Committee v. Block, 840 F.2d 714, 717 (9th Cir. 1988).  An agency's decision not to prepare an EIS under NEPA is reviewed under the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2)(A), which requires the Court to determine "whether the agency has taken a hard look at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant." Nat'l Parks and Conservation Ass'n v. Babbitt, 241 F.3d 722, 730 (9th Cir. 2001).

NEPA establishes important "action-forcing" procedures to ensure that the "broad national commitment to protecting and promoting environmental quality" is "infused into" the actions of the federal government. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989). Under NEPA, an agency must take a hard look at any action that has a substantial impact on the

human environment.  Save the Yaak Committee v. Block, 840 F.2d 714, 717 (9ᵗʰ Cir. 1988); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989); Kleppe v. Sierra Club, 427 U.S. 390, 409 (1976); Muckleshoot Indian Tribe v. United States Forest Serv., 177 F.3d 800, 814 (9ᵗʰ Cir. 1999).  "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."  Robertson v. Methow Valley , 490 U.S. at 348.  The Defendants' failure to complete an SEIS  should result in an  injunction on any further design, or pursuing or entering in any agreements such as the Highway Easement Deed("HED"), Amended Project Cooperation Agreement ("PCA"), Relocation Agreement, and Land Management Agreement necessary to construct the Recommended Plan, as well as its construction, due to the Corps' failure to comply with  NEPA.  See LRR/EA at 1-19. "[W]hen a decision to which NEPA obligations attach is made without informed environmental decision making, the harm that NEPA intends to prevent has been suffered . . . .  Moreover, to set aside the agency's action at a later date will not necessarily undo the harm."  Massachusetts v. Watt, 716 F.2d 946, 952 (1ˢᵗ Cir. 1983) (citations omitted).  Because an agency may "become committed to the previously chosen course of action," a new decision is not likely to be a different one. Id.  The Corps' own regulations recognize this potential harm by prohibiting actions during the NEPA process that would have an adverse environmental impact, limit the choice of reasonable alternatives, or prejudice the ultimate decision on the program.  See 33 C.F.R. § 230.22 (adopting  40 C.F.R. §1506.1).

> a.    **The Corps Failed to Conduct the SEIS Required Under NEPA**

To determine whether an agency needs to perform an EIS, the agency prepares an environmental assessment ("EA") discussing the need for the proposed action, alternatives, and the environmental impacts of the proposed action and alternatives.  See Hill v. Boy, 144 F.3d 1446, 1449-50 (11th Cir. 1998); see also 40 C.F.R. § 1508.9.  In the EA, the agency must consider the direct, indirect and cumulative impacts of proposed activities as well as the significance of those impacts on the environment.  40 C.F.R. §§  1508.7, 1508.8, 1508.27(b).  Based on the EA, as well as regulations promulgated by the CEQ, the agency will then either prepare an EIS or issue a FONSI. Hill, 144 F.3d at 1449-50.  A FONSI is permitted only if the proposed action will not significantly

affect the environment and the FONSI determination must be supported by a statement of reasoning and evidence, not merely conclusions. Id. at 1450; 40 C.F.R. § 1508.13.  Furthermore, 40 CFR § 1502.9(c) requires that agencies:

> 1. prepare supplements to either draft or final environmental impact statements if:
>
> (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or
>
> (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. . . . .
> 4. Shall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.

The Corps' adoption of Alternative 3.2.2.a, which was the TSP in the April 2008 LRR/EA that became the Recommended Plan in the June 2008 LRR/EA, is a major federal action significantly and adversely affecting the quality of the human environment, within the provisions of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C).  DE 17 at ¶89.  According to Colonel Terry Rice, who has dealt directly with NEPA as the former Commander of the Army Corps of Engineers, Alternative 3.2.2.a is a new alternative that is significantly different from Alternative 14 that was analyzed in the Tamiami Trail 2005 Final RGRR/SEIS.  Rice Affidavit at ¶7.  Colonel Rice also states that based on his professional experience with NEPA, the Corps has failed to follow requirements of NEPA in adopting the Recommended Plan. Id.  The Recommended Plan will significantly and adversely affects the physical environment, including but not limited to destruction of natural resources in Everglades National Park, destructive flooding and degradation of the central Everglades in WCA-3A, decreased Everglades biodiversity, destruction of Everglades tree islands and injury to wildlife, and increased risk of flooding of land interests of the Tribe.  Jones Affidavit at ¶¶10-17, 25-29. These impacts should have been analyzed in an SEIS, as is required under NEPA. Rice Affidavit at ¶¶10-15.

9

When the proposed action changes, the agency must determine whether the changes create, or the information reveals, significant effects on the quality of the human environment, not previously considered. <u>Marsh v. Or. Natural Res. Council,</u> 490 U.S. 360, 374 (1989).  Despite the Corps' assertions that the proposed action would not cause significant effects on the quality of the human environment, and that an EIS was not required, it could not rationally make this conclusion without taking the "hard look" required by NEPA. Rice Affidavit at ¶9**;** Jones Affidavit at ¶18. Alternative 3.2.2.a, the Recommended Plan, is a new alternative with significant new impacts on the quality of the human environment that were not analyzed in the 2005 Final RGRR/SEIS on the Tamiami Trail component**.** Rice Affidavit at ¶7.  When new, significant effects are shown, the agency must prepare an SEIS. 20 C.F.R. 1502.9(c)(1).  As discussed below, the affidavits of Colonel Terry Rice and Dr. Ron Jones both detail significant new impacts on the human environment that must be analyzed in an SEIS.

First, the Corps failed to assess the environmental impacts on WCA 3A, the residents of Miami-Dade County, and the Osceola Camp that the immediate operational changes that will be caused by the bridge will cause. <u>See</u> Rice Affidavit at ¶¶12-13**;** Jones Affidavit at ¶¶16-17.  A review of the LRR/EA shows that it only assessed impacts in a limited project area. Second, the LRR/EA contains no analysis of the Corps' proposal to allow the contractor to block a culvert bank  along Tamiami Trail in the construction footprint of the bridge. Rice Affidavit at ¶9.  By the Corps own admission in a permit application to the Florida Department of Environmental Protection ("FDEP") on June 11, 2008, blocking these culverts for up to 500 days could cause water levels to rise in WCA 3A by .25 feet and stop as much as 776 acre feet from draining from WCA 3A. DE 17at ¶74;  Rice Affidavit at ¶9; <u>See</u> Attachment "C" to Rice Affidavit.  The Corps did not analyze the impact that raising these water levels will have on the natural resources in WCA 3A, including the tree islands, Snail Kite and Snail Kite critical habitat. Rice Affidavit at ¶9.  Third, the Recommended Plan will result in the destruction of land in Everglades National Park, the Tribe's ancestral home to which it has customary use and occupancy rights. Jones Affidavit at ¶¶20-33. The Tribe, and its members, will suffer irreparable harm from losing the use of the these lands. <u>Id.</u> at ¶32. Future generations of Americans, to which Congress entrusted these lands, will also be harmed. <u>Id.</u> at ¶33.

While the Corps argues that the one mile eastern bridge is a segment of Alternative 14, a one mile eastern bridge and two mile western bridge Alternative 14 that had been previously subject to the 2005 RGRR/SEIS, Colonel Rice explains that there are significant differences and impacts that have not been analyzed. Rice Affidavit at ¶7. Dr. Jones explains the damage that will result to Tribal Everglades and to ENP from the unanalyzed impacts of the project. Jones Affidavit at ¶¶20-33. By failing to conduct an SEIS on the new Alternative 3.2.2.a, Defendants violated NEPA, 42 U.S.C. § 4332, and the regulations implementing NEPA, 40 C.F.R. §§ 1500 to 1508. Indeed, a review of the voluminous telephone book size LRR/EA is evidence that an SEIS was required. According to CEQ, (NEPA's 40 Most Asked Questions, 46 Fed. Reg. 18026, Question 36b), in most cases, "a lengthy EA indicates that an EIS is needed."

### b.    The Corps' LRR/EA Was Legally Insufficient and Woefully Inadequate

An environmental assessment serves to:(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; (2) Aid an agency's compliance with the Act when no environmental impact statement is necessary; and (3) Facilitate preparation of a statement when one is necessary. 40 C.F.R. § 1508.9(a). The EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). The legally insufficient EA failed to contain an adequate alternatives analysis, and failed to list the names of the peer reviewers that were consulted.

In addition, Defendants violated NEPA in their adoption of the Recommended Plan by failing to conduct an SEIS and by, in the LRR/EA, improperly 1) narrowing the purpose, scope and geographic action area of the project; 2) relying on a skewed environmental analysis; 3) relying on an arbitrary and capricious analysis that abandoned, and failed to analyze, reasonable alternatives; 4) refusing to explore project alternatives involving culverts and swales, and cleaning areas downstream of the existing culverts, which would be more cost effective and allow the Modified Water Deliveries Project to be implemented faster to relieve the flooding of the Everglades in WCA 3A; 5) arbitrarily and capriciously rejecting all non-bridge alternatives and abandoning all swale alternatives; 7)  improperly segmenting the Tamiami Trail component of the MWD Project by

transferring the environmental analysis of swales to a separate NEPA process to be conducted by Everglades National Park on which it will be a cooperating agency; and 8) failing to adequately analyze the impacts on the water quality in Everglades National Park, an Outstanding Florida Water ("OFW"); 9) announcing it would complete the design of the TSP in May, 2008, prior to the adoption of a FONSI. in violation of NEPA and implementing regulations of the Council on Environmental Quality, 42 C.F.R. §§ 1502.2; and 10) failing to take the hard look required by NEPA and instead adopting the *pro forma* advisory committee's recommendation, which rendered the EA process meaningless. See Rice Affidavit at ¶¶7-20.

### 2. Bridging Eastern Tamiami Trail Violates WRDA 2000

In 1996, Congress directed the Corps to develop a "Comprehensive Plan for the purpose of restoring, preserving, and protecting the South Florida ecosystem," in response to growing concern about the health of Florida's Everglades. See Water Resources Development Act of 1996, Pub. L. No. 104-303, § 528, 110 Stat. 3658 (Oct. 12, 1996). The Water Resources Development Act of 2000 ("WRDA 2000") adopted the Comprehensive Everglades Restoration Plan ("CERP"). WRDA 2000 required that the Modified Water Deliveries Project be completed before a second project that calls for the raising of the eastern portion of Tamiami Trail, the CERP WCA 3 Decompartmentalization Project, could be funded and constructed. Section 602(b)(2)(D)(iv) of WRDA 2000 entitled *Modified Water Delivery* states: "No appropriation shall be made to construct the Water Conservation Area 3 Decompartmentalization and Sheetflow Enhancement Project (including component AA, Additional S-345 Structures; component QQ Phase 1, Raise and Bridge East Portion of Tamiami Trail and Fill Miami Canal within WCA 3; component QQ Phase 2, WCA 3 Decompartmentalization and Sheetflow Enhancement; and component SS, North New River Improvements) or the Central Lakebelt Storage Project (including components S and EEE, Central Lakebelt Storage Area) until the completion of the project to improve water deliveries to Everglades National Park authorized by Section 104 of the Everglades National Park and Expansion Act of 1989 (16 U.S.C. 410r-8)."

The LRR/EA, which proposes building a one mile eastern bridge on Tamiami Trail as the Recommended Plan violates the express prohibition in WRDA 2000 against bridging the east portion

of Tamiami Trail until the MWD Project is completed.  Defendants' adoption of the Recommended Plan, which proposes bridging an east portion of Tamiami Trail, is in violation of WRDA 2000, and Defendants acted in a manner that is arbitrary, capricious an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706.  Defendants have no authority to bridge an east portion of Tamiami Trail under the Modified Water Deliveries Project.  WRDA 2000 prohibits Defendants from bridging the east portion of Tamiami Trail until the Modified Water Deliveries Project is completed.

### B.   The Tribe Faces a Substantial Threat of Irreparable Injury if Defendants' Arbitrary and  Capricious Conduct is Not Immediately Enjoined.

### 1.   NEPA

### a.   Procedural Harm

The "harm at stake in a NEPA violation is a harm to the environment." Sierra Club v. Marsh, 872 F.2d 497, 504 (1st Cir. 1989).  "But the risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation." Id.  Allowing Defendants to adopt the Recommended Plan without completing an SEIS, creates harm that is irreparable.  The Supreme Court has found that the purpose of NEPA is the protection of decision making procedures.  Robertson v. Methow Valley Citizens Council, 490 U.S. at 351.  Bias resulting from agencies committing to actions without completing adequate impact statements constitute irreparable harm.  Friends of the Earth v. Hall, 693 F. Supp. 904, 913, 936-37, 949 (W.D. Wash. 1988).  Moreover, "alleged violations of NEPA are themselves irreparable since the purpose of NEPA is to ensure that the agency and the public is aware of environmental consequences of a project before construction commences." Provo River Coalition v. Pena, 925 F.Supp. 1518 (Utah Central Division, 1996) (citing Sierra Club v. Hodel, 848 F.2d 1068, 1097 (10th Cir. 1988)); Sierra Club v. Marsh, 872 F.2d 497, 503-04 (1st Cir. 1989).

### b.   Harm to the Tribe Through Flooding of WCA-3A and other Tribal Property and Through Destroying and Giving Away Lands to Which it Has Legal Rights

The Everglades is the home of the Miccosukee people and is integral to their culture, subsistence, religion, historical identity, and way of life. DE 17 at ¶2.  The Tribe has land interests

in vast areas of the Everglades, including a perpetual lease to 189,000 acres of Everglades in WCA-3A that is to be kept in its natural state. DE 17 at ¶3. The Tribe also has customary use and occupancy rights in its ancestral home in Everglades National Park. See 16 U.S.C. § 410(b); 16 U.S.C. §§ 410r-5 - 410r-8; Miccosukee Reserved Area Act, PL 105-313, 112 Stat. 2964; LRR/EA at 3-26 to 3-27. Any action that alters or destroys the Everglades, or prevents its restoration, directly and substantially injures, harms and damages each and every Miccosukee interest. See, e.g. Northern Cheyenne Tribe v. Hodel, 851 F.2d 1152, 1158 (9th Cir. 1988) (irreparable harm includes "cultural, social, and economic costs"). Both the public interest in seeing that the Corps complies with NEPA, FACA and WRDA 2000, and the protection of the culture and way of life of the Miccosukee Tribe, warrant an injunction of Defendants' illegal conduct.

Flooding and excess water levels above natural levels in WCA-3A for any significant period of time degrades the ecological health of the Everglades, such as the tree islands and biodiversity, including the endangered Snail Kite and its designated critical habitat. Jones Affidavit at ¶¶14-15; DE 17 at ¶80. A healthy WCA-3A is integral to the Tribe's religious practices and lifestyle as well as their use and enjoyment of the Tribal land. Jones Affidavit at ¶16. Despite its biological importance, the LRR/EA did not include WCA 3A in the area that was analyzed for environmental impacts. Jones Affidavit at ¶8. In a permit application, the Corps proposed blocking eastern culverts for up to 500 days during the construction of the bridge. Id. at ¶10; Rice Affidavit at ¶9. Although the Corps' permit application shows that blocking these culverts under certain conditions will raise water levels in WCA 3A, and prevent water from draining from it, the Corps failed to analyze the environmental impacts it would cause in the LRR/EA. Jones Affidavit at ¶12. In the opinion of renowned Everglades ecologist Dr. Ron Jones, closing off the culverts will exacerbate the high water levels in WCA 3A and adversely impact the vegetation and wildlife there, including the endangered Snail Kite and its critical habitat. Id. at ¶¶10-14; see also Rice Affidavit at ¶9. In the opinion of former Corps Commander Colonel Terry Rice, the cumulative impacts of the current water management operations and blocking of the culverts should have been analyzed in an SEIS. Rice Affidavit at ¶9.

The Corps failed to analyze the impacts that the Recommended plan will have on WCA 3A and ENP, as well as endangered species. Jones Affidavit at ¶¶6-33. The Corps also failed to analyze the significant impact on the quality of the human environment will cause by the Recommended Plan

immediately changing operations by allowing an increase in flow volume of 15.2% due to the construction of the bridge alone without any increase in the stage of the L-29 canal. Rice Affidavit at ¶¶10, 13. The change in flow volume and distribution that will be caused by the construction of the bridge could adversely impact the Tribe's Miccosukee Resort, private property in Miami-Dade County and the Osceola Camp. Rice Affidavit at ¶¶12-13. The Corps failed to analyze the impacts that will immediately result from the construction of the bridge even with no raising of the canal and must do so in an SEIS. Rice Affidavit at ¶13.. Finally, the construction and operation of the bridge will result in immediate irreparable harm to the Tribe because it will require taking away Park lands, to which Tribal members have customary use and occupancy rights, away for all time. Jones Affidavit at ¶32. These, and other impacts that will be caused by the Recommended Plan, must be analyzed in an SEIS.

### 2.    **WRDA 2000**

The statutory language of WRDA 2000 clearly prohibits the authorization of funds for raising and bridging eastern Tamiami Trail until the Modified Water Delelivies Project is completed. See WRDA 2000, § 601, Pub. L. No. 106-541 (S2796)(2000); 114 Stat. 2572, Section 602(b)(2)(D)(iv). The Eleventh Circuit has often recognized that "[w]here the language Congress chose to express its intent is clear and unambiguous, that is as far as we go to ascertain intent because we must presume that Congress said what it meant and meant what it said." Adams v. Florida Power Corp., 255 F.3d 1322, 1324 (11th Cir. 2001); see also United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998). "When voting on appropriations measures, legislators are entitled to operate under the assumption that funds will be devoted to purposes which are lawful and not for any purpose forbidden." TVA v. Hill, 437 U.S. 153, 190 (1978). Raising eastern Tamiami Trail under the Modified Water Delelivies Project is clearly forbidden by WRDA 2000. Since the Corps' plan is contrary to the clear language of the statute, it is not entitled to deference and may not be implemented. See Sierra Club v. Martin, 168 F.3d 1, 5 (11th Cir. 1999) ("Since the agency's position is contrary to the clear language of the Plan and the statute, it is not entitled to deference."). The Tribe has suffered irreparable harm because of Defendants' unlawful plan to bridge an east portion of Tamiami Trail in violation of WRDA 2000. Rice Affidavit at ¶¶23-24. This unlawful conduct will perpetuate high water levels on Tribal Everglades in WCA 3A and could flood Tribal businesses along Krome

Avenue, which the Modified Water Deliveries Project and CERP Decompartmentalization Project are designed to relieve and prevent. Jones Affidavit at ¶17.

### C.      The Balance of Harms Tips Heavily in Favor of the Tribe and Congress

An injunction is the appropriate remedy for a substantive procedural violation of an environmental statute. See Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir. 1985). "Irreparable damage is presumed when an agency fails to evaluate throughly the environmental impact of a proposed action." Save Our Ecosystems v. Clark, 747 F.2d 1240, 1250 (9th Cir. 1984). "It does not appear that any lower court, much less the Supreme Court, has ever found in a proceeding on the merits that federal actions violating NEPA could continue in opposition to the statutory mandates." Id. at 1250. NEPA's requirements are not discretionary and require compliance by an agency "to the fullest extent possible" unless there is clear conflict of statutory authority.  See Calvert Cliffs' Coordinating Committee v. U.S. Atomic Energy Commission, 449 F.2d 1109, 1115 (D.C. Cir. 1971) (quoting 42 U.S.C. § 4332).   Even where the cost of compliance with NEPA is high, "[c]onsiderations of administrative difficulty, delay or economic cost will not suffice to strip [NEPA] of its fundamental importance."  Id. at 1115; see also Wisconsin v. Callaway, 371 F.Supp. 807, 812 (W.D. Wisc. 1974). Caselaw supports that "[i]rreparable harm results where environmental concerns have not been addressed by the NEPA process."  Protect Key West v. Cheney, 795 F.Supp. 1552, 1563 (S.D. Fla. 1992).  Requiring the Corps to complete an SEIS on the Recommended Plan before implementing it will further the purpose of NEPA and will not harm Defendants.

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable" National Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 737 (9th Cir. 2001) (quoting Amoco Prod. Co. v. Gambell, 480 U.S. 531, 545 (1987)).  "If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."  Amoco, 480 U.S. at 545.  "When the 'proposed project may significantly degrade some human environmental factor,' injunctive relief is appropriate."   National Parks & Conservation Ass'n v. Babbitt, 241 at 737 (quoting Alaska Wilderness Recreation & Tourism Assoc. v. Morrison, 67 F.3d 723, 732 (9th Cir. 1995)); Save the Yaak Committee v. Block, 840 F.2d 714, 722 (9th Cir. 1988).

Congress has expressly prohibited constructing such a bridge until water flow under the

Tamiami Trial is restored by means other than bridging the eastern Tamiami Trail, i.e., the project proposed in the LRR/EA.  See WRDA 2000, § 601.  Therefore, the balance of harms also tips in favor of Plaintiff Tribe since Defendants' actions defy the will of Congress in enacting WRDA 2000.

      The harm caused by Defendants' failure to comply with NEPA and WRDA 2000 is both actual and procedural.  The Tribe, and its members, are harmed by Defendants' failure to comply with federal law and by the physical consequences of that failure. There are reasonable alternatives to restore flows through Tamiami Trail "to the extent practicable" that do not require defying the will of Congress by building a bridge in ENP.  Rice Affidavit at ¶¶18-19.  Given other existing alternatives for the Corps that could accomplish the same goals more expeditiously, and without the use of any park lands, no harm would result from delaying this project until an SEIS is completed.. Rice Affidavit at ¶19.  Indeed, the Corps can not even claim that the Recommended Plan will be beneficial to the Everglades without the review required under federal law. Rice Affidavit at ¶9. Thus, the balance of harms tips in favor of the Tribe regarding the Defendants' failure to comply with NEPA and WRDA 2000.

      **D.**    **An Injunction on NEPA and WRDA 2000 Will Serve the Public Interest**

      Allowing the Corps to implement the Recommended Plan without having conducted the required NEPA analysis, and in violation of WRDA 2000, harms not only the Tribe's interests, but the public interest as well.  In addition to the harm to the environment, allowing agencies to disregard  federal law harms the public interest by keeping them uninformed and allows agencies to make uninformed and potentially harmful decisions that affect the public.  The public interest is only served by requiring agencies to follow NEPA.  See, e.g. Mylan Pharmaceuticals v. Shalala, 81 F. Supp.2d 30, 45 ("It is in the public interest for courts to carry out the will of Congress and for an agency to implement properly the statute it administers.").  "[G]ood administration of [a] statute is in the public interest and that will be promoted by taking timely steps when necessary to prevent violations even when they are about to occur or prevent their continuance after they have begun." Florida Key Deer v. Stickney, 864 F. Supp. 1222, 1241 (S.D. Fla. 1994) (quoting Louis v. Meissner, 530 F.Supp. 924, 929 (S.D. Fla. 1981)).  As this Court noted in Florida Key Deer, "[t]he substantive and procedural provisions . . . are the means determined by Congress to assure adequate protection. Only by requiring compliance with the act's procedures can we effectuate the intent of the

legislature." <u>Florida Key Deer</u>, 864 F.Supp. at 1241 (quoting <u>Sierra Club v. Marsh</u>, 816, F.2d 1376, 1384 (9th Cir. 1987).

IV.   <u>**FACA**</u>

    A.   **The Corps Violated FACA**

      Congress enacted the Federal Advisory Committee Act ("FACA") in 1972 to reform the use of advisory committees by the Executive Branch. Specifically, the Act aims to reduce the number of unnecessary committees and to increase the uniformity of procedures for the committees that are necessary. 5 U.S.C.App. 2 § 2(b). An "advisory committee" is defined in the Act as "any committee, board, commission, council, conference, panel, task force, or other similar group" that is "established or utilized" by the President or an agency "in the interest of obtaining advice or recommendations" for one or more federal agencies or officers. 5 U.S.C.App. 2 § 3(2). To achieve its goal, FACA places a number of requirements on advisory committees, including filing a detailed charter, giving advance notice in the Federal Register of any meetings, generally holding open meetings, having an officer or employee of the federal government preside over or attend every meeting, making records available to the public, and if the committee is established by legislation or created by the President or other federal official or agency, being "fairly balanced in terms of the points of view represented and the functions to be performed" and not being "inappropriately influenced by the appointing authority or by any special interest." 5 U.S.C.App. 2 §§ 5, 9, 10.

      The Corps established an advisory group of federal and non-federal participants (the "LRR Team") to provide advice and recommendations in LRR/EA process, but did not follow the requirements of FACA, and in so doing, acted in a manner that is arbitrary, capricious an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706. This group met regularly in closed door meetings to provide advice and recommendations to federal participants, including federal agencies and officers, which utilized their advice and recommendations on the Recommended Plan. DE 17 at ¶111. The advisory group participated in a Modified Water Deliveries (MWD) Tamiami Trail Modification (TTM) Benefits Workshop in Jacksonville, Florida on October 23-24, 2007 that was not publicly noticed, not open to the public, and Plaintiff Tribe was not invited to attend. <u>Id.</u> at ¶112. The advisory group developed arbitrary and capricious

performance measures and cost estimates, and used a skewed environmental benefits analysis, to screen out reasonable swale and culvert alternatives and retain only bridge alternatives for final consideration. Id. at ¶114.

The LRR advisory group included members from both the Corps and ENP, as well as non-federal participants from at least the South Florida Water Management District and the State of Florida Department of Environmental Protection. DE 17 at ¶109. The Corps has violated FACA insofar as this advisory committee has failed to, and continues to fail to follow the provisions of FACA, which include the following: (1) be fairly balanced in terms of the points of views represented; (2) file a detailed charter; (3) give advance notice of any meetings in the Federal Register; (4) make all records available to the public; (5) hold all meetings in public; (6) otherwise comply with requirements associated with formation and conduct of proceedings. 5 U.S.C. App. §§ 5, 8, 9, 10.

**B.     FACA would be eviscerated if injunctive relief were not granted**

Unless the injunctive relief requested herein is granted, the Tribe will suffer further significant irreparable injury in that its rights to know about, attend and participate in matters that impact Plaintiff's homelands in the Everglades will be abridged and denied. Furthermore, the Corps will continue to unlawfully rely on advice given by the advisory group that includes non-federal participants with their own vested interested that could endorse plans that benefit their own interest at the expense of Plaintiff Tribe.

The only relief that will ensure future compliance FACA is an injunction, and voiding of the product of this tainted procedure, which is the Recommended Plan. "We find injunctive relief as the only vehicle that carries the sufficient remedial effect to ensure future compliance with FACA's clear requirements . . . Anything less would be tantamount to nothing." Alabama-Tombigbee Rivers Coalition v. Department of Interior, 26 F.3d 1103, 1107 (11th Cir. 1994). To allow the government to use the product of a tainted procedure would circumvent the very policy that serves as the foundation of FACA. Id. This Court should grant injunctive relief since1) FACA has been violated and 2) FACA would be "eviscerated if such relief were not granted." See C.B. v. Board of Scholl

Com'rs of Mobile Co., AL, 261 Fed.Appx. 192, 194  (11th Cir. 2008).

## CONCLUSION

A review of the record, including all filings and affidavits, indicates that the Defendants were required to comply with NEPA, FACA and WRDA 2000 in connection with the adoption of the Recommended Plan for the Tamiami Trail component of the Modified Water Deliveries Project, but utterly failed to do so.  Plaintiff has a substantial likelihood of success on the merits, and will suffer irreparable harm if this Court does not force the Defendants to comply with NEPA, FACA and WRDA 2000.  Balancing of the equities and the public interest militate in favor of entering a preliminary injunction to preserve the status quo pending final adjudication of this case.

WHEREFORE, the Tribe respectfully requests that the Court find, for all the reasons stated, that:

a)  Defendants have failed to comply with NEPA, and are enjoined from implementing the Recommended Plan until they have fully comply with their lawful obligations under NEPA;

b)  Defendants are enjoined from entering into any construction agreement, Project Cooperation Agreement, Land Agreement, Highway Easement Deed, Relocation Agreement, or any other contract or agreement for the Recommended Plan, or constructing the Recommended Plan, until it has complied with NEPA and completed a lawful SEIS process;

c)  Defendants have failed to comply with FACA, and are enjoined from implementing the any products of the advisory group, including the Recommended Plan, until they have fully complied with their lawful obligations under FACA;

d)  Defendants are enjoined from relying on any advice given by the advisory group in the future and the advisory group is enjoined form meeting or acting in violation of FACA;

e)  the Recommended Plan adopted by Defendants  violates WRDA 2000 and is outside Defendants' authority to implement under the Modified Water Deliveries Project;

f)  the Tribe is granted all reasonable fees and costs associated with this motion; and

g)  all such other relief as the Court deems just and proper.

Respectfully submitted,

LEHTINEN RIEDI BROOKS MONCARZ, P.A.
Attorneys for the Miccosukee Tribe of Indians
7700 North Kendall Drive, Suite 303
Miami, Florida  33156-7559
Telephone: (305) 279-1166; Fax: (305) 279-1365
fmoncarz@lehtinenlaw.com

By:    /s/   Dexter W. Lehtinen
DEXTER W. LEHTINEN, Florida Bar No.: 265551
FELIPPE MONCARZ, Florida Bar No.: 182109
KELLY BROOKS SMITH, Fla. Bar No. 493341

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 6th day of August, 2008, a true and correct copy of the foregoing Motion for Preliminary Injunction was filed electronically with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

By: _____/s/_____ Felippe Moncarz_____

FELIPPE MONCARZ, ESQ.

**Edward S. Geldermann**
United States Attorney's Office
99 NE 4th Street
Miami, FL 33132
202-305-0242
Fax: 202-305-0506
Email: jay.geldermann@usdoj.gov

**Mark A. Brown**
United States Department of Justice
PO Box 7369 Ben Franklin Station
Washington, DC 20044-7369
202-305-0204
Fax: 202-353-7763
Email: mark.brown@usdoj.gov